UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

               Plaintiff,

      v.

$7,877.61 UNITED STATES CURRENCY,

               Defendant.

_____

<u>DECISION & ORDER</u>

09-CV-6306P

## PRELIMINARY STATEMENT

The United States of America has filed this civil in rem forfeiture action pursuant to 21 U.S.C. § 881(a)(6) seeking forfeiture of $7,877.61 in United States currency.  (Docket # 1). Claimant Harvey A. Bailey ("Bailey") has responded to the complaint, claiming an interest in the seized currency.  (Docket # 4).  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 21).

Currently pending before the Court is the government's motion for summary judgment.  (Docket ## 67, 84).  For the reasons discussed below, the motion is denied.

## THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The government seeks summary judgment on the grounds that the materially undisputed evidence demonstrates that the seized currency is substantially connected to narcotics trafficking.  (Docket # 68 at 2).  According to the government, the undisputed facts demonstrate that Bailey was engaged in the sale of narcotics, and the currency, along with other drug-related

paraphernalia, was seized from his residence.  (*Id.* at 8).  The government further relies on the

fact that, as a result of the evidence seized from Bailey's residence, he was convicted for

possession of narcotics with intent to sell.  (*Id.*).  Finally, the government maintains that the

undisputed evidence demonstrates the absence of any legitimate source for the currency.  (*Id.* at

9).  Bailey opposes the motion, contending that material issues of fact preclude a finding that the

seized currency was substantially connected to narcotics trafficking.[1]  (Docket # 78 at 15-16).

### A.    Factual Background

In opposition to the pending motion, Bailey purports to dispute virtually every

statement of fact and evidentiary submission made by the government.  (Docket ## 78, 89).

Bailey's opposition to the government's submission, however, primarily consists of conclusions

of law and conclusory denials not based upon personal knowledge and lacking citation to

admissible evidence.  Thus, although Bailey has attempted to dispute every aspect of the

government's motion, the record reveals that many material facts are indeed undisputed.  *See*

---

[1]  Much of Bailey's submissions consist of challenges to the validity of his arrest and the search warrants for his person and residence.  (Docket # 78 at 9-13, 21, 27, 29, 33-34, 37, 39, 42-46, 50-57).  Bailey maintains that there was an absence of probable cause for his arrest and the warrants because they relied almost exclusively upon the information provided by a confidential information whose reliability was not known to officers.  (*Id.*).  Bailey litigated this issue during his criminal proceedings and on appeal of those proceedings.  *See Bailey v. Moscicki*, 2012 WL 5420111, *1-2 (W.D.N.Y. 2012).  The appellate court specifically determined that "the information provided by the CI was within her personal knowledge and against her penal interest, and was corroborated by the personal observations of the police[,] . . . [and therefore] was sufficiently reliable to create probable cause to believe that [Bailey] was engaging in or had engaged in illegal activity and that contraband would be found within his apartment."  *Id.* at *2 (quoting *People v. Bailey*, 80 A.D.3d 999 (3d Dep't), *leave to appeal denied*, 18 N.Y.3d 856 (N.Y. 2011)).  Bailey raised the same challenges in his habeas petition filed in federal court pursuant to 28 U.S.C. § 2245.  *Id.* at *1.  United States District Court Judge Michael A. Telesca determined that Bailey was precluded from challenging the Fourth Amendment violations because he had had a full and fair opportunity to litigate those claims before the state courts.  *Id.* at *3-4.  I similarly conclude that Bailey is precluded from collaterally attacking the validity of his arrest and the warrants in this case.  *See United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 663 (6th Cir. 2003) (claimants collaterally estopped from litigating validity of search warrant where the validity of the search warrant was upheld in the criminal proceeding; "[t]he issues were identical, the issue was actually litigated in the first proceeding, and the issue was 'necessary and essential to the judgment on the merits'") (quoting *United States v. Three Tracts of Prop.*, 994 F.2d 287, 290 (6th Cir. 1993)); *United States v. All Funds on Deposit in Account Nos. 94660869, 9948199297, 80007487, 9115606297, 9116151903, 9931127481 in the Names of Annette Bongiorno and/or Rudy Bongiorno at Citibank, N.A.*, 2011 WL 4344229, *2 (S.D.N.Y. 2011) (claimants barred from litigating constitutional violations that were litigated during criminal trial; "[g]iven that [the claimants] fully litigated identical claims in the criminal action . . . , this [c]ourt finds that these claims are precluded under the doctrine of collateral estoppel").

*Acme Am. Repairs, Inc. v. Katzenburg*, 2011 WL 3876971, *2 (E.D.N.Y. 2011) ("[p]laintiffs'

flat denial, unsupported by any evidence . . . , is insufficient to create a genuine issue of material

fact as to that issue"), *motion to certify appeal denied*, 2012 WL 3307426 (E.D.N.Y. 2012);

*Field v. Tonawanda City Sch. Dist.*, 604 F. Supp. 2d 544, 556 (W.D.N.Y. 2009) ("[i]t is

fundamental that to avoid summary judgment a plaintiff . . . must point to admissible evidence

demonstrating a material issue of fact . . . and may not rely on their pleadings or mere denials of

a defendant's statement of undisputed facts"); *Standard Ceramics, Inc. v. Carborundum Corp.*,

2000 WL 743954, *1 (W.D.N.Y. 2000) ("where the moving party has carried its burden, mere

denials, conclusory statements or a demonstration that there is 'some metaphysical doubt as to

the material facts' will be insufficient to create a genuine issue of fact") (quoting *Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

   That said, Bailey has asserted some factual information based upon his own

personal knowledge and has attached documentary evidence in support of some of his factual

assertions.  In other words, some of the facts asserted by the government are genuinely disputed

by Bailey, and the question becomes whether those disputes are material to the outcome of the

pending motion.

   The following recitation of facts is undisputed unless otherwise noted.  On June

30, 2008, at approximately 2:00 a.m., William R. Solt, III ("Solt") and Matthew D. Saunders

("Saunders"), two police officers employed by the Elmira Police Department, were approached

by a confidential informant ("CI").  (Docket # 67-1 at ¶ 1 and Exhibits ("Exs.") A and B).

According to the officers, the CI informed them that on several occasions she had purchased

crack cocaine from Bailey, who resided at 323 West Church Street, Elmira, New York.  (*Id.*).

The CI advised the officers that she could order from Bailey up to $100 quantities of crack

cocaine and that Bailey typically made deliveries by bicycle.  (*Id.*).  Bailey questions the plausibility of the officers' account and challenges the CI's veracity, but does not submit admissible evidence to dispute the officers' sworn account of what the CI told them.  (Docket # 78 at 28, 43).

Officer Saunders accompanied the CI to her residence and, in Saunders's presence, called the number she identified as Bailey's cell phone.  (Docket # 67-1 at ¶ 2 and Ex. B at ¶ 5).  The CI was unable to reach Bailey.  (*Id.*).  The CI then called Bailey's home phone number and spoke to Stephanie Rounsville ("Rounsville"), who lived at the residence.  (*Id.*).  The CI told Rounsville that she needed a "yard" of crack cocaine.  (*Id.*).  The CI indicated that Rounsville had informed her that Bailey was not home, but would be home shortly and would call the CI.  (*Id.*).  Saunders then left the CI's residence and shortly thereafter observed Bailey riding his bike on West Church Street.  (Docket # 67-1 at Ex. B at ¶ 6).

The CI was subsequently interviewed by Saunders and gave a sworn statement under penalty of perjury.  (Docket # 67-1 at Exs. B at ¶ 9; 5).  During the interview, the CI informed Saunders that at approximately 2:45 a.m. Bailey called her after the officer had left her residence and she ordered crack cocaine from Bailey.  (Docket # 67-1 at ¶ 3; Ex. B at ¶ 9; 5).  She told Bailey that she had the money, and Bailey replied that he was on the way to her house.  (*Id.*).  The CI then notified the police that Bailey was on his way.  (*Id.*).  The CI also stated that she had previously purchased crack cocaine from Bailey more than twenty-five times.  (Docket # 67-1 at Ex. 5).  The purchases occurred at her residence and at Bailey's residence.  (*Id.*).  According to the CI, she typically contacted Bailey by calling his cellular phone or his home phone and speaking to either Bailey or Rounsville.  (*Id.*).  Bailey usually rode to the CI's residence on his bicycle to deliver the narcotics to her.  (*Id.*).  According to the CI, Bailey stored

4

narcotics in his bedroom and in the kitchen.  (*Id.*).  The CI also advised the officers that she was

a recovering drug addict and wanted to help the police put a stop to drug dealing in her

neighborhood.  (*Id.*).

        Bailey disputes that he spoke to the CI that morning or at any other time.  (Docket

# 78 at 22).  He further maintains that the CI never ordered drugs from him.  (*Id.*).  He also

challenges the CI's veracity, noting that she is an admitted narcotics user.  (*Id.*).  Finally, Bailey

asserts that the CI has never been to his residence, to his knowledge.  (*Id.* at 28).

        While Saunders was with the CI, Officer Solt approached Bailey's residence in

order to conduct surveillance.  (Docket # 67-1 at ¶ 4 and Ex. A at ¶ 4).  Saunders contacted Solt

and informed him that the CI had made the call and that Bailey should be arriving at his

residence shortly.  (Docket # 67-1 at Ex. A at ¶ 4).  Approximately two minutes later, Solt

observed a male riding a bicycle approach and enter 323 West Church Street.  (*Id.* at ¶ 5).  After

approximately two minutes, the same male exited the residence and began to ride his bicycle

west on West Church Street.  (*Id.*).  This individual was subsequently identified as Bailey and

was detained by law enforcement officers.  (*Id.* at ¶¶ 6-7).  After Bailey refused to consent to a

search of his person, law enforcement obtained search warrants for Bailey and his residence.

(*Id.*).

        Bailey does not dispute that he rode his bicycle to his residence early that

morning.  (Docket # 84-1 at 20).  According to Bailey, he stopped by his apartment on his way to

his girlfriend's residence in order to obtain approximately fifteen dollars.  (*Id.*).  Bailey also does

not dispute that the police detained him, although he challenges the legal justification for his

detention.  (Docket # 78 at 11).  Bailey contends that he was searched on the street despite his

refusal to provide consent.  (*Id.*).  According to Bailey, the officers did not find any illegal drugs

on him during the initial search on the street, nor did they find any during a subsequent search at the police station.  (*Id.* at 5-6).  The government does not dispute that law enforcement did not find any narcotics on Bailey's person.  (Docket # 67-1 at ¶ 8).

Later that morning, Elmira City Court Judge Steven Forrest issued warrants authorizing searches of Bailey and his residence.  (Docket # 67-1 at ¶ 6 and Exs. 1 and 2). Saunders participated in the execution of the search warrant at the residence and was accompanied by at least four other members of the Elmira Police Department, Carl U. Mustico ("Mustico"), Richard E. Weed ("Weed"), Sergeant Bresser ("Bresser"), and Alfred Chandanais ("Chandanais").  (Docket # 67-1 at Exs. B, C, D and 7).

During the search, Saunders located a "small plastic baggie containing a white chunky substance."  (Docket # 67-1 at Exs. B at ¶ 11; 8a-8b).  According to Saunders, based upon his training and experience, he recognized the substance to be crack cocaine.  (*Id.*).  Bresser alerted Saunders to a quantity of currency located in a drawer of a built-in dresser in the living room/bedroom area of the apartment.  (Docket # 67-1 at Ex. B at ¶ 12).  The currency was hidden beneath the bottom of the drawer underneath tinfoil.  (Docket # 67-1 at Exs. B at ¶ 12; 8g-8j).  In total, the dresser drawer contained $6,809.  (Docket # 67-1 at Exs. B at ¶ 16; 11).  The currency consisted of the following denominations:  29 $100 bills; 19 $50 bills; 141 $20 bills; 13 $10 bills; 1 $5 bill and 2 $2 bills.  (Docket # 67-1 at Ex. 11).  In the same room, Saunders also discovered and seized $232.61 in loose coins in a dresser drawer, along with a GPS system and a night vision scope.  (Docket # 67-1 at Ex. B at ¶ 13).

In a kitchen cupboard, Saunders found and seized a small baggie of seeds that appeared to him to be marijuana seeds.  (Docket # 67-1 at Exs. B at ¶ 14; 8c-8d).  Saunders also discovered a small plastic baggie containing a white, chunky substance underneath a mop in the

kitchen corner.  (Docket # 67-1 at Exs. B at ¶ 15; 8e-8f).  Saunders believed that the substance was crack cocaine.  (*Id.*).

Mustico discovered a quantity of currency under the mattress in the living room/bedroom area of the apartment.  (Docket # 67-1 at Exs. C at ¶ 3; 8k-8m).  The currency, which totaled $836.00, consisted of the following denominations:  5 $100 bills; 1 $50 bill; 12 $20 bills; 4 $10 bills and 6 $1 bills.  (Docket # 67-1 at Exs. C at ¶ 3; 11).  Mustico seized seven cellular telephones, a digital scale and a mechanical scale from the bedroom/living room area of the apartment.  (Docket # 67-1 at Ex. C at ¶ 5).  According to Mustico, he recognized these items to be paraphernalia used by street-level drug traffickers, based upon his training and experience. (*Id.*).

Chandanais recalled searching the kitchen area of the apartment during the execution of the search warrant.  (Docket # 67-1 at Ex. 7 at 130).  On a shelf unit behind the kitchen door, Chandanais discovered a glass tube containing a white, chunky substance.  (*Id.*). He believed that the substance was crack cocaine, and a field test of the substance was positive for cocaine.  (*Id.* at 130, 137).  Chandanais gave the tube to Bresser for processing.[2]  (*Id.* at 131, 137).

Chandanais, who worked with a nationally-certified narcotics and tracking canine, returned to the police department with his canine, Finney, after the execution of the search warrant was completed.  (*Id.* at 135).  Bresser placed the two sets of currency that had been seized from the residence into two separate envelopes.  (*Id.*).  Bresser hid the envelopes in an office in the police department, and Chandanais brought Finney into the office to search.  (*Id.*). Finney alerted to the two envelopes, signaling the presence of narcotics.  (*Id.* at 136).

---

[2]  I disagree with Bailey's contention that Chandanais's testimony demonstrates that the glass tube was not sent to the New York State Police Lab for analysis.  (*See* Docket # 78 at 14, 60-61, 88-89).

Bailey does not dispute that the seized items were located inside his residence, although he professes that he had no personal knowledge about them. (Docket # 78 at 38, 69). Bailey further disputes that the baggies located in the apartment contained narcotics on the grounds that the government has not provided any evidence demonstrating that the substances in the baggies were tested or the results of any such testing. (*Id.* at 35). According to Bailey, the total amount of suspected crack cocaine seized from his residence was approximately one-tenth of a gram. (Docket # 84-1 at 68).

Additionally, Bailey asserts that the canine was walked through his residence prior to the search and failed to alert on anything. (*Id.* at 13, 35). In support of this assertion, Bailey attaches a police report completed by Chandanais that states that Finney searched the apartment and that "K9 Finney did not alert to the odor of narcotics in the apartment." (*Id.* at 76). Based upon this information, Bailey contends that it is improbable that narcotics were subsequently discovered there. (*Id.* at 13, 35). Bailey also questions the validity of Finney's subsequent alert to the envelopes containing the currency at the police department. (*Id.* at 15, 78).

Bailey was arrested and charged with criminal possession of a controlled substance in the third degree on June 30, 2008, in violation of Section 220.16.1 of the New York Penal Law. (Docket # 67-1 at ¶ 11 and Ex. 12). That section prohibits the possession of narcotics with the intent to sell. N.Y. Penal Law § 220.16.1. On January 21, 2009, a jury convicted Bailey of the charge, and on March 6, 2009, he was sentenced as a predicate felon to a seven-year term of imprisonment and a three-year term of supervised release. (Docket # 67-1 at ¶¶ 14-15 and Ex. 12). Bailey disputes the validity of his conviction, but does not dispute that he was charged, tried, convicted, and sentenced. (Docket # 78 at 16-18).

Bailey disputes that the currency seized from his residence was connected to narcotics.  (*Id.* at 19).  He denies that he ever possessed narcotics and maintains that the currency came from a legitimate source.  (*Id.* at 10, 19).  According to Bailey, he had saved the currency over the course of his lifetime from earnings from his employment and other odd jobs that he performed.  (*Id.* at 19).  Bailey, who was forty-six years old at the time of the seizure, contends that a person his age could be expected to have accumulated some wealth.  (Docket # 84-1 at 78).  Bailey further maintains that he is so adept at saving money that his family members observe that he "know[s] how to hold a dollar until the eagles holler."  (*Id.* at 75).  Bailey asserts that he did not keep his money in a bank account because he does not trust banks and has had problems with a checking account in the past.  (Docket ## 78 at 19; 84-1 at 38, 78).

In support of his assertions, Bailey submitted his tax returns for the years 2003 through 2008.  (Docket # 78 at 107-33).  Those returns report that he earned $792 in 2003, $190 in 2004, $5,595 in 2005, $10,370 in wages and $2,944 in unemployment compensation in 2006, and $3,937 in wages and $384 in unemployment compensation in 2007.  (*Id.*).  Bailey concedes that he was unemployed in 2008, but maintains that he was not unemployed for the entire year.  According to Bailey, he worked odd jobs to pay his rent in 2008.  (Docket # 84-1 at 18-19, 75).

**B.**     **Discussion**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this determination, the court must assess whether there are any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991).  A

9

fact is "material" only if it has some effect on the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d at 97.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the non-moving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts.  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 586).  The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of
> the litigation is carefully limited to discerning whether there are
> any genuine issues of material fact to be tried, not to deciding
> them.  Its duty, in short, is confined at this point to issue-finding; it
> does not extend to issue-resolution.  . . . [I]t must be kept in mind
> that only by reference to the substantive law can it be determined
> whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Section 881(a)(6) of Title 21 of the United States Code subjects to forfeiture (1) any currency that is "furnished by any person in exchange for a controlled substance,"

(2) any "proceeds traceable to such an exchange," and, (3) any currency "used or intended to be used to facilitate in violation of this subchapter." 21 U.S.C. § 881(a)(6).  In 2000, Congress enacted the Civil Asset Forfeiture Reform Act ("CAFRA") (codified principally at 18 U.S.C. § 983) in order to "consolidate[] and dramatically overhaul[] the procedures for civil judicial forfeiture proceedings." *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967*, 731 F.3d 189, 195 (2d Cir. 2013).  The Act imposes a "heightened standard" upon the government to demonstrate that seized property is subject to forfeiture. *Id.* at 196.  Specifically, under CAFRA, "the burden of proof is on the [g]overnment to establish, by a preponderance of the evidence, that the property is subject to forfeiture."[3]  18 U.S.C. § 983(c)(1).  Unlike the pre-CAFRA framework, the Act contains no shifting burden of proof; rather, "if the government fails to meet its burden of proof[,] . . . the claimant has no 'case' that he must present or 'elements' to which he bears the burden of proof." *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967*, 2014 WL 2575308, *1 (W.D.N.Y. 2014) (quoting *$557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 79 (2d Cir. 2002)).

"[W]here, as here, the [g]overnment seeks forfeiture pursuant to 21 U.S.C § 881(a)(6) on a theory that the [currency] constitutes proceeds 'traceable to' an exchange for narcotics, it need not prove that there is a substantial connection between the [currency] and any *specific* drug transaction." *Id.* at *2 (emphasis added).  Instead, the government must demonstrate generally, "based on a totality of the circumstances, that the [currency] is

---

[3] "This 'preponderance of the evidence' standard replaced the 'probable cause' standard applied in the pre-CAFRA forfeiture cases." *United States v. $11,640.00 in U.S. Currency*, 2014 WL 4217389, *5 (N.D.N.Y. 2014).  Previously, "[t]he government was *not* required, as part of its initial burden, to demonstrate 'a substantial connection between the drug activities and the property in question, but only a nexus between them.'" *United States v. Sum of $185,336 U.S. Currency Seized from Citizen's Bank Account L7N01967*, 731 F.3d at 195.  Under the earlier standard, once the government had satisfied this burden, "the ultimate burden of proof then shifted to the claimant 'to show by a preponderance of the evidence that the property was not subject to forfeiture.'" *Id.* (quoting *United States v. Parcel of Prop.*, 337 F.3d 225, 227 (2d Cir. 2003)).

substantially connected to narcotics trafficking." *Id.* (quoting *United States v. U.S. Currency in the Sum of One Hundred Eighty-Five Thousand Dollars ($185,000) More or Less and Twenty-Four Thousand Six Hundred Fifty Dollars ($24,650) More or Less*, 455 F. Supp. 2d 145, 149 (E.D.N.Y. 2006), *aff'd*, 280 F. App'x 36 (2d Cir. 2008)).

The government maintains that the totality of the undisputed facts demonstrates that the seized currency is substantially connected to illegal drug activity and therefore subject to forfeiture. (Docket # 68 at 7-12). To establish the substantial connection, the government relies upon three evidentiary provisions: (1) the currency was seized with other drug trafficking physical evidence from Bailey's residence; (2) Bailey was convicted of possession of narcotics with intent to sell based upon the evidence seized from his residence; and, (3) no proof exists of any legitimate source for the sizeable amount of currency found in Bailey's home. (*Id.*). According to the government, there are no material disputed facts with respect to any of these propositions. As explained below, I disagree and find that issues of fact preclude summary resolution of the government's forfeiture action.

The government is correct that no dispute exists that Bailey was convicted of possession of narcotics with intent to sell as a result of the evidence seized from his residence on June 30, 2008. (*Id.* at 8-9). The government has submitted the certificate of conviction and, although Bailey asserts that his conviction was obtained in violation of his constitutional rights, he concedes that his conviction was upheld on appeal. (Docket # 84-1 at 77). Although Bailey cannot dispute that he was convicted of a drug-related offense in connection with this seizure, applicable caselaw demonstrates, and the government does not appear to dispute, that the conviction alone is insufficient to demonstrate a substantial connection between the seized currency and narcotics trafficking. *See United States v. Sum of $185,336.07 U.S. Currency*

12

*Seized from Citizen's Bank Account L7N01967*, 2014 WL 2575308 at *3 (a drug-related

conviction by itself insufficient to establish substantial connection as matter of law); *United*

*States v. Real Prop. & Premises Known as 90-23 201st St., Hollis, New York*, 775 F. Supp. 2d

545, 564 (E.D.N.Y. 2011) ("'[t]he government may rely upon a claimant's narcotics conviction,

as one factor, to meet its burden of establishing the requisite connection between funds and drug

activity'[;] . . . [s]tanding alone, however, the court finds [the claimant's] convictions insufficient

to establish, as a matter of law, the requisite connection by a preponderance of the evidence")

(quoting *United States v. United States Currency in the Amount of Two Hundred Forty-Eight*

*Thousand Four Hundred Thirty Dollars ($248,430)*, 2004 WL 958010, *4 (E.D.N.Y. 2004)).

        In addition to Bailey's drug trafficking conviction, the government also relies

upon the other evidence that was seized during the execution of the search warrant and the fact

that a trained canine alerted to the currency.  (Docket # 68 at 8).  With respect to the canine alert,

courts throughout the country differ as to the relative weight to be accorded a positive canine

alert on currency.  *See*, *e.g.*, *United States v. $252,300.00 in U.S. Currency*, 484 F.3d 1271, 1275

(10th Cir. 2007) (acknowledging existence of "debate over the significance of a drug-dog alert

on currency"); *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy*

*Dollars*, 403 F.3d 448, 455 (7th Cir. 2005) (acknowledging scientific debate concerning

probative value of canine alerts to currency); *United States v. $22,991.00, more or less, in U.S.*

*Currency*, 227 F. Supp. 2d 1220, 1233-34 (S.D. Ala. 2002) ("[a]lthough courts are divided as to

the weight to be accorded evidence of [canine alerts on currency], it is commonly recognized that

such evidence is of at least minimal probative value, and should be considered in the totality of

the evidence presented in a civil forfeiture action"); *United States v. $94,010.00 U.S. Currency*,

1998 WL 567837, *3 (W.D.N.Y. 1998) (recognizing that "the weight accorded such evidence is

13

a matter of current controversy[,] . . . [although] the Second Circuit Court of Appeals has suggested that a narcotics-detecting dog's alert to contaminated currency may be construed as evidence linking the seized currency to narcotics").  Some courts have emphasized the importance of a "sophisticated dog alert," which demonstrates that "the dog reacts only to ephemeral by-products of narcotics and not to commonly circulated currency," in evaluating probable cause.  *See United States v. U.S. Currency $42,500.00*, 283 F.3d 977, 982 (9th Cir. 2002).  Other courts have relied upon empirical scientific studies that "no properly trained dog" would alert to a quantity of currency "if it had contained only innocently tainted bills."  *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d at 462.

What weight, if any, should be accorded the canine alert in this case is further complicated by Bailey's apparently uncontested assertion that the canine did not alert to the currency when it was inside Bailey's residence.  (Docket ## 78 at 76; 86 at 28).  Although the government may be able to offer an explanation for the lack of response, it has not done so in connection with this motion.  Considering the paucity of information concerning the canine, its training, and the methodology employed for the two searches, the canine alert to the currency does little at this stage to strengthen the government's assertion of a substantial connection between the currency and Bailey's drug trafficking activity.

I find that no dispute exists that the remaining items identified by the government were seized from Bailey's residence.  Although Bailey attempted during his deposition to disassociate himself from the residence (Docket # 84-1 at 20), he has nonetheless admitted that the apartment was his residence and that he was present there on the morning of the investigation that led to the issuance of the search warrant (*id.* at 8-10, 20).  Further, although Bailey contends that he had no knowledge about the suspected crack cocaine and marijuana seeds, night vision

scope, scales, and the glass pipe with residue that field-tested positive for narcotics, he has not disputed that they were found in the residence during the warrant execution.  Unquestionably, the presence of this evidence in the same residence as the currency supports the inference of a connection between the currency and narcotics trafficking.  *See United States v. $7,696.00 in U.S. Currency*, 587 F. App'x 352, 353 (8th Cir. 2014) (per curiam) (summary judgment affirmed, noting, *inter alia*, "[t]he government's evidence showed that the property (cash in various denominations) was seized in close proximity to other evidence of drug trafficking"); *United States v. Ten Thousand Seven Hundred Dollars and No Cents in U.S. Currency*, 258 F.3d 215, 224 (3d Cir. 2001) ("claimants' possession of drugs or drug paraphernalia at the time of the seizure[] would support the government's theory that the money in claimant's possession is connected to illegal drug trafficking"); *United States v. $22,991.00, more or less, in U.S. Currency*, 227 F. Supp. 2d at 1233 ("courts have recognized that, for purposes of a civil forfeiture action, the physical location of the subject property to the drugs, at the time those items are detected by law enforcement, is strong circumstantial evidence of narcotics trafficking") (collecting cases).

The government also relies upon statements made by the CI to the police and the sworn statement of Stephanie Rounsville, the other individual who resided at Bailey's residence, to establish a connection between the currency and narcotics trafficking.  Bailey disputes the veracity of many of the statements made by both witnesses.  (Docket # 78 at 22, 28, 40, 47-49, 50-52).  Such disputes, which necessarily involve credibility determinations, are properly resolved by the trier of fact at trial rather than as a matter of law on summary judgment.

Although the presence of crack cocaine and drug paraphernalia in Bailey's home and his drug trafficking conviction certainly suggest a connection between the currency and

narcotics violations, Bailey has submitted sworn statements denying, as he did in his deposition and in his interrogatory responses, that the currency was connected to drug sales and representing that it constituted his life savings.  The government maintains that Bailey's assertions are "implausible" and are insufficient to raise a material issue of fact.  (Docket # 84 at ¶¶ 5, 18-20).  I disagree.

Although "a great disparity between the amount of cash seized and [the claimant's] legitimate income creates an inference of illegal activity," *United States v. $11,640.00 in U.S. Currency*, 2014 WL 4217389 at *7 (quoting *United States v. U.S. Currency in the Sum of One Hundred Eighty-Five Thousand Dollars ($185,000)*, 455 F. Supp. 2d at 155), the amount of currency that was seized from Bailey's home is not so substantial that, standing alone, it justifies a suspicion of illegal activity.  *United States v. Twenty One Thousand Dollars ($21,000) in U.S. Postal Money Orders and Seven Hundred Eighty-Five Dollars ($785.00) in U.S. Currency*, 298 F. Supp. 2d 597, 604 (E.D. Mich. 2003) (sum of $21,785 not "a sufficiently large sum of money as to warrant a suspicion of illegal activity") (citing *United States v. $5,000 in U.S. Currency*, 40 F.3d 846, 850 (6th Cir. 1994)).  In essence, the government maintains that the Court should reject as a matter of law Bailey's proffered explanation as to the source of the currency because it rests on bald, unsubstantiated assertions.[4]  (Docket # 84 at ¶ 19).  The law is well-settled, however, that "[t]o reject testimony because it is unsubstantiated and self-serving is to weigh the strength of the evidence or make credibility determinations – tasks belonging to the trier of fact."  *United States v. Funds in the Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 717 (7th Cir. 2013).  Although bare denials or

---

[4]  The government also asserts that "[b]ased on the training and experience of law enforcement officers, the predominance of twenty ($20) dollar bills is characteristic of currency received by drug distributors from their customers and provided by them to their suppliers, in payment of past or future deliveries," but has not supported that assertion with reference to any admissible evidence.  (Docket # 84 at ¶ 19).

conclusory allegations "might be found, in light of overwhelming evidence to the contrary, 'incredible as a matter of law,'" a sworn affidavit providing an explanation for the source of the currency, even if self-serving and unsubstantiated, may be enough to raise a genuine issue of fact as to the source of the funds. *See United States v. $7,300 in U.S. Currency*, 2003 WL 21496858, *6 (S.D.N.Y. 2003) (quoting *United States v. One Parcel of Prop. Located at 15 Black Ledge Dr., Marlborough, Conn.*, 897 F.2d 97, 102 (2d Cir. 1990)) ("[claimant] does not simply deny the [g]overnment's claim that the money was derived from drug trafficking; rather, she offers an alternative, albeit undetailed and uncorroborated, account of where the money came from").

Bailey, who was forty-six years old at the time of the seizure, asserts that the seized currency is his life savings. According to Bailey, his tax returns demonstrate that he was employed during the years preceding the seizure. Although he was unemployed during the year that the seizure occurred, Bailey asserts that he was able to pay for his living expenses by performing odd jobs. Bailey describes himself as adept at savings and explained that he has an aversion to banks.

While the trier of fact may ultimately conclude that the government's position concerning the source of the currency is credible, this Court cannot say at this stage that no reasonable trier of fact could credit Bailey's assertions. *See United States v. $7,300 in U.S. Currency*, 2003 WL 21496858 at *6. On this record, considering the quantity of currency at issue, the probative (but not overwhelming) circumstantial evidence of a connection between the currency and narcotics trafficking arising from Bailey's conviction and the presence of currency, a small amount of cocaine, and drug paraphernalia in Bailey's home, Bailey's age and his proffered explanations as to the source of the currency and his reasons for storing the currency in his residence, I conclude that a genuine issue of material fact exists as to the source and thus

forfeitability of the currency seized. *See United States v. Funds in the Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d at 718 (claimant's affidavit stating that currency was accumulated from his employment during a period of time when he lived rent-free with his parents created issue of fact; "[i]f believed, [claimant's] affidavit testimony provides the trier of fact with a basis for finding that [claimant] legally accrued (or, at least *could have* legally accrued) the [seized currency]"); *United States v. $28,720.00 in U.S. Currency*, 2014 WL 3729730, *4 (W.D.N.C. 2014) ("[t]he [c]laimants have asserted . . . that these funds were obtained from legitimate sources, namely, a loan, a sale of a vehicle, and income from odd jobs" and "viewing as the [c]ourt must the record in the light most favorable to the non-moving parties, there are genuine issues of material fact as to whether this cash was honestly derived"); *Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967*, 2014 WL 2575308 at *3 ("[t]he unanswered questions regarding the source of [claimant's] income considered in conjunction with [claimant's] narcotics conviction[ ] could lead a reasonable [finder of fact] to find that the requisite connection exists[;] [b]ut a reasonable [finder of fact] could also reach the opposite conclusion") (alterations in original) (quoting *United States v. Real Prop. & Premises Known as 90-23 201st St., Hollis, New York*, 775 F. Supp. 2d at 564); *United States v. $14,000 in U.S. Currency*, 2014 WL 1230497, *5 (D. Ariz. 2014) ("[claimant] claims that he earned the bulk of the seized money from working in his construction business [and] [t]he [g]overnment argues that this implausible explanation further weighs in favor of forfeiture"; however, "[t]he [c]ourt cannot weigh the evidence at the summary judgment stage and declare [claimant] to be not credible"); *United States v. $22,010.00 in U.S. Currency*, 2010 WL 4813011, *4-5 (M.D. Ga. 2010) (claimant asserted that the seized funds were proceeds from the sale of a vehicle; although inconsistencies in claimant's explanation

raised "serious questions regarding the credibility of [claimant's] story, they d[id] not undermine [claimant's] evidence in support of his contentions to the point that there is no longer a genuine issue of material fact to be determined"); *United States v. $40,000 in U.S. Currency*, 2010 WL 4625883, *3 (W.D.N.C. 2010) ("[c]laimant testified that he . . . frequently collects his rent in cash and uses that cash to pay day laborers[] . . . [and] that he had saved a lot of cash in a safe at home due to concerns about Y2K and had never returned it to the bank[;] . . . credibility determinations posed in this case, which the [g]overnment admits are extant, are for a [trier of fact], not the[c]ourt [on summary judgment]"); *United States v. $61,200.00 in U.S. Currency, more or less*, 805 F. Supp. 2d 682, 692 (S.D. Iowa 2010) ("[t]he government has not offered evidence contradicting, as a matter of law, claimant's assertion that the bulk of the defendant currency was the product of his life savings[;] . . . [t]he [c]ourt finds there is a genuine issue of material fact on the origin of the defendant currency"); *$7,300 in U.S. Currency*, 2003 WL 21496858 at *4, 6 (claimant's affidavit stating that seized currency represented proceeds of sale of vehicle created genuine issue of material fact as to source of currency); *United States v. Funds in the Amount of Twelve Thousand Dollars ($12,000.00), Sixteen Thousand Dollars ($16,000.00) & Four Thousand One Hundred Dollars ($4,100.00)*, 1996 WL 717454, *4 (N.D. Ill. 1996) (claimant's assertion that a friend had provided the $4,100 in currency that was seized constituted "an arguably legitimate account" for the source of the currency, thus precluding summary judgment).

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment

(**Docket # 67**) is **DENIED**.  A <u>trial date status conference</u> will be held with the undersigned on

**November 12, 2015,** at **11:00 a.m.**  Arrangements will be made with the correctional facility for

Bailey to participate by telephone.

**IT IS SO ORDERED.**

                                                      *s/Marian W. Payson*
                                          ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
                                                   MARIAN W. PAYSON
                                             United States Magistrate Judge

Dated: Rochester, New York
           September 30, 2015